## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JUUL LABS, INC.,

      Plaintiff,

      v.

4X PODS., GREGORY GRISHAYEV,
AND THE ELECTRIC TOBACCONIST,
LLC,

      Defendants.

Civ. No. 18-15444 (KM) (MAH)

**OPINION**

### KEVIN MCNULTY, U.S.D.J.:

Now before the Court is a motion by plaintiff Juul Labs, Inc. ("Juul") for a prejudgment asset freeze in the form of a temporary restraining order ("TRO") and preliminary injunction. (DE 110). Juul moves for this relief based on its discovery of defendants' text messages, which appear to discuss plans to secrete assets and avoid paying a judgment should one be entered.

4X PODS and Gregory Grishayev (collectively, "defendants") oppose this relief. (DE 130). Defendant 4X PODS is the brand used by Eonsmoke LLC ("Eonsmoke") when marketing and selling a series of e-cigarette products. Eonsmoke is co-owned by defendant Gregory Grishayev and Michael Tolmach.[1]

For the following reasons, Juul's motion is denied as presented. These emails, however, raise a sufficient concern of misconduct, and I will impose a requirement of quarterly financial reporting.

---

[1]    Mr. Tolmach is not named as a defendant in the Verified Complaint. (DE 1). Juul has filed a motion to amend the complaint (DE 108), seeking to add Mr. Tolmach as a defendant and substitute Eonsmoke LLC d/b/a 4X Pods for 4X Pods as a defendant.

# I. BACKGROUND

## A. Factual Background[2]

Juul is a market leader in the "e-cigarette" market. Juul has developed and marketed an Electronic Nicotine Delivery System ("ENDS") that comprises a device and an insertable pod filled with a proprietary blend of vaporized carriers, nicotine, salt extracts, and flavoring. (Cplt. ¶ 3). These pods are disposable and come in a variety of flavors. Juul markets its products using a variety of trademarks and trade dress, including a Juul "Pod Logo" trademark (Reg. No. 5304697). (DE 111 at 9). The Pod Logo mark "is two-dimensional and consists of a vertical rectangle with an elongated hexagon shape inside the rectangle with the hexagon located at approximately the center of the rectangle." (Cplt. ¶ 22). It appears to be a stylized depiction of the pod itself.

Juul's packaging trade dress is not registered as such. Nevertheless, Juul asserts that its packaging, considered as a whole, constitutes a distinct dress: a monochromatic box with a white background, minimalist text, a brand name in distinctive font on the upper left corner of the packaging, and a stack of the Juul Pod Logo trademarks running vertically down the right side of the packaging. (Cplt. ¶¶ 25–26; DE 111 at 18–19).

Juul alleges that defendants, beginning in June 2018 (*see* Cplt. ¶ 52), purposely designed and promoted their infringing "4X PODS" products to look like Juul products, thereby reaping the benefits of the Juul brand name. (*Id.* ¶ 4). Juul asserts that defendants' packaging copies the Juul trade dress. The packaging of certain 4X PODS has many of the same features: a white background, the company name in capital letters in the upper left side portion of the packaging, and a stack of pod-like images that run down the right side of

---

[2] Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Cplt." = The Verified Complaint filed in this action. [DE 1].

the packaging. (DE 111 at 10). The latter, pod images are also alleged to infringe the Juul Pod Logo trademark.

Juul contends that Eonsmoke's products contain unregulated ingredients, in violation of FDA standards, and have not undergone strict quality controls. (Cplt. ¶¶ 4, 5). Thus, says Juul, defendants' use of Juul's likeness degrades Juul's business goodwill. (Id. ¶ 54).

### B. The Complaint and Initial Preliminary Injunction

In October 2018, to prevent the further distribution and sale of these allegedly infringing products, Juul filed a Verified Complaint against defendants alleging trademark infringement, trade dress infringement, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1116, 1117, 1125(a), copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101, et seq., trademark infringement and unfair competition under N.J. Stat. Ann § 56:4–1, and various state law torts as a result of defendants selling their 4X PODS products.

At the time, Juul also moved to enjoin defendants' use of Juul's Pod Logo trademark and Juul's packaging trade dress. Juul asserted in the Verified Complaint that defendants copied the Juul Pod Logo and Juul packaging trade dress in connection with defendants' packaging and sale of certain 4X PODS products. (Cplt. ¶¶ 40–53).

On October 30, 2018, I entered an order to show cause. (DE 4). Having reviewed the documents filed by Juul, I stated that, based on those documents, it appeared that Juul had demonstrated that it was "likely to succeed in showing that Defendants are selling products that infringe JLI's trademarks and trade dress." (Id. at 1).

The parties submitted a consent preliminary injunction, which I ordered on December 6, 2019. (DE 29). Defendants agreed to be preliminary enjoined from:

> a) Directly or indirectly adopting, using, registering, or seeking to register any trademark, service mark or other type of mark, material, company, business or domain name, or other name, that would cause a likelihood of confusion with, tarnish, dilute, cause

blurring, lessen the significance or value of, or otherwise infringe JLI's trademarks, trade dress or copyrights, as alleged in the Verified Complaint. Included within the meaning of a likelihood of confusion and infringement would be any mark, name, package, or product that would cause a false or misleading association, connection, sponsorship, or affiliation with or endorsement by JLI;

b) Manufacturing, shipping, delivering, holding for sale, advertising, Marketing, promoting, displaying, transferring or otherwise moving, storing, distributing, renting, or otherwise disposing of, in any manner (including through operation of any website), the 4X Product and/or related products referenced in the Verified Complaint, or colorable imitations thereof which use the Juul Pod Logo Trademark, Juul Packaging Trade Dress, and/or Copyrighted Works (as defined in the Verified Complaint);

c) Further infringing JLFs trademarks, trade dress and copyrights, and from injuring and damaging JLI's goodwill and reputation; and

d) Doing any act or thing likely to confuse, mislead, or deceive others into believing that Defendants, or any of them and/or their products or services emanate from or that Defendants themselves are connected with, sponsored by endorsed by, or approved by or otherwise affiliated with JLI.

(DE 29 at 3–4).

### c. This Motion for TRO and Preliminary Injunction

On October 17, 2019, defendants produced a number of documents in discovery, including Skype messages between Mr. Tolmach and Mr. Grishayev sent in October and November 2018. In these messages, Mr. Tolmach and Mr. Grishayev express in no uncertain terms that they will never pay any judgment that may ultimately be entered in this action:

Mr. Tolmach: Juul hitting us with a separate civil lawsuit for jury trial also.

Mr. Tolmach: so one lawsuit for ITC for injunction and also one for civil lawsuit for penalties. even if we lose lawsuit,

. . .

Mr. Tolmach: even if we lose the lawsuit, I will never sign check to Juul or ever pay them

Mr. Tolmach: will declare bankrupcy [sic] before that, so only attorneys getting paid here

(DE 111-1 at 10).

In a separate series of messages with a supplier in China, Mr. Grishayev voiced similar sentiments:

Mr. Liu:  worst case you stop this project and working on others

Mr. Liu:  even if you lose the lawsuit

Mr. Grishayev:  nah lawsuit i dont care

Mr. Grishayev:  just care for FDA

Mr. Liu:  you move your money away and apply for bankrupt [sic]

Mr. Grishayev:  yeah

Mr. Liu:  then start of a new company

Mr. Grishayev:  im not worried

Mr. Grishayev:  you can even still have same company lol

Mr. Grishayev:  even with bankrupt[cy] here in the usa

(DE 111-1 at 15).

Juul was understandably alarmed by these messages. Compounding that alarm were internal communications showing Mr. Tolmach and Mr. Grishayev communicating with each other to make a number of money transfers from their Eonsmoke business checking account—a Chase checking account with account number ending in 3070—to a Chase brokerage account, account number ending in 5906. This brokerage account is co-owned by Mr. Grishayev and Mr. Tolmach, and is nicknamed the "family office account" or the "family account." (DE 111 at 14–15).

The messages concerning these accounts suggest that defendants were—unusually—treating both the Chase checking account and the Chase brokerage account as Eonsmoke's business accounts:

Mr. Tolmach:  gotta have like 5-10 mil on the books for Eonsmoke

Mr. Tolmach:  if you wanna be in mclane etc

Mr. Tolmach:  but then again checking account pays 0, it's stupid to carry 800k in the checking

*Mr. Tolmach:  guess we will just treat family office like the Eon checking acct for next few years*

> Mr. Tolmach:  and will move money back into eon checking topay
> huge taxes this time next year
>
> Mr. Grishayev:  Exactly

(DE 111-1 at 6 (emphasis added)).

By letter filed January 23, 2020 (DE 154), Juul supplemented its presentation with another set of text messages, turned over in discovery, between Messrs. Grishayev and Tolmach:

> Mike T: Now juul is trying tactics like lobbying Chinese government and buying up all the nicotine
>
> Mike T: They're mad creative
>
> Mike T: Moved another mil to fam office since we literally can't send money away fast enough

(Bates EON026958; DE 154-1) This exchange is in the same vein as the November 2018 messages already before the court. Counsel states that it dates from some six months later, in April 2019. (It is not clear whether the date April 25, visible on the printout, relates to this exchange or the following one.)

Defendants represent that they are sweeping money out of the Chase checking account and into the brokerage "family" account to enjoy higher interest rates or investment returns. When they need funds to pay company taxes and expenses, however, they move money back from the brokerage account to the checking account. Juul replies that these texts will bear the interpretation that they are moving funds to preserve them from actions and threatened actions by Juul.

In response to discovering these messages, Juul filed a motion to amend its Verified Complaint (DE 108) and moved for a prejudgment asset freeze in the form of a temporary restraining order and a preliminary injunction (DE 111). Juul asserts that it is entitled to freeze *all* of defendants assets in both Chase accounts because it is likely to succeed in showing that defendants' 4X PODS packaging infringes on Juul's Pod Logo trademark and packaging trade dress. (DE 111 at 6–7).

Juul also based its asset freeze motion on newly asserted claims in the proposed Amended Complaint. (*See* DE 108, 109-1). Juul adds in the Amended Complaint a claim for trademark infringement of the "JUUL" Wordmark, a federally-registered trademark that Juul uses to identify the source of its products (DE 109-1 ¶ 26). Juul alleges in its proposed Amended Complaint that defendants' improperly used the JUUL wordmark in its social media and online marketing by, for example, using hashtags that create a false impression that defendants' products are genuine JUUL products. (*Id.* ¶ 61).

Juul has alleged that defendants' net revenue from the sale of all 4X PODS products was $5,209,882 and that defendants had approximately $30 million in net revenue from the sales of all of their products. (*Id.* at 30). Of this revenue, Juul estimated that defendants had transferred at least $2.1 million from the company's checking account to the Chase brokerage "family" account. (DE 111 at 15). This was an estimated figure, says Juul, because defendants had not produced all of the relevant documents regarding these transfers and therefore Juul did not know how much money had actually been transferred. (*Id.*).

In connection with signing the Order to Show Cause, I authorized supplementary, expedited discovery in advance of the return date. Magistrate Judge Hammer quite soundly made a decision to prioritize discovery of financial assets. (DE 132) It appears that at least some such discovery occurred.

At oral argument, Juul presented additional documentation that showed that as of November 2019, the "family" brokerage account contained approximately $30 million in assets. (*See* EON026465). Juul also highlighted testimony where Mr. Tolmach admitted that he and Mr. Grishayev personally made a total of $40 million selling Juul-compatible pods (DE 137-1 at 23), and that defendants have generated over $70 million in revenue from the sale of Juul-compatible products. (*See* January 6, 2020 transcript at 48). Juul did not parse out what portion of this $70 million in revenue was attributable to profits

from the sale of products that allegedly infringe Juul's Pod Logo mark or Juul's packaging trade dress (the claims at issue in the Verified Complaint (DE 1)). Nor did Juul outline what portion of this $70 million was derived from the sale of products that purportedly infringe the Juul wordmark (the new claim added in the proposed Amended Complaint (DE 109-1)). As to the allegedly infringing 4X PODS products, however—the subject of the currently operative complaint—Juul concedes that total profits were approximately $400,000 to $500,000. (January 6, 2020 transcript at 50).

## II.   DISCUSSION

As a threshold matter, the parties dispute whether under the Supreme Court's guidance in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, this Court can grant a prejudgment asset freeze. 527 U.S. 308, 119 S. Ct. 1961 (1999). *Grupo Mexicano* held that a court is not authorized to freeze a defendant's assets solely to preserve a plaintiff's right to recover damages. There, plaintiffs had sought a preliminary injunction restraining Grupo Mexicano from transferring assets because it was alleged that Grupo Mexicano was at risk of insolvency, or already insolvent; that it was planning preferential transfers of its most valuable assets to its Mexican creditors; and that these actions would frustrate any judgment plaintiffs could obtain. *Id.* at 312–13. The Supreme Court held that a plaintiff who sued for breach of contract seeking damages, a remedy at law, could not obtain a preliminary injunction against the assets of a debtor against whom it had no judgment. *Id.* at 332–33.

In doing so, however, the *Grupo* Court drew on a historical distinction between law and equity. It suggested that the issuance of a restraint of assets in connection with an action for *equitable* relief would be appropriate. *Id.* at 324–25 (distinguishing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S. Ct. 229 (1940), noting that in *Deckert* "the preliminary injunction 'was a reasonable measure to preserve the status quo pending a final determination of the questions raised by the [equitable] bill' ")).

Here Juul, in addition to seeking monetary damages, has also sought equitable relief in the form of an accounting and disgorgement of profits. (Cplt. p. 26). Juul seeks this asset freeze to preserve its ability to enjoy those equitable remedies. *Grupo Mexicano* permits the use of a prejudgment asset freeze to preserve a plaintiff's equitable remedies. *See Sweet People Apparel, Inc. v. Fame of NY, Inc.*, Civ. No. 11-1666, 2011 WL 2937360 at * (D.N.J. July 19, 2011) (*Grupo Mexicano* permits prejudgment asset freeze in case seeking equitable accounting of defendants' profits under the Copyright and Trademark Acts). There being no categorical bar to such relief, I consider whether the requirements of a preliminary injunction have been met.

### A. Standard of Review

A plaintiff seeking a preliminary injunction must establish

[1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and

[4] that an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (line breaks and numbering added); *accord Am. Ex. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *see also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 (3d Cir. 2000) (movant bears the burden of establishing these elements).

A court will consider all four factors, but the first two are essential: A court may not grant injunctive relief, "regardless of what the equities seem to require," unless plaintiffs carry their burden of establishing both a likelihood of success and irreparable harm. *Adams*, 204 F.3d at 484; *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by

the district court where either or both of these prerequisites are absent."
(quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir.
1982)); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Freixenet, S.A. v.
Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *Am. Ex.*, 669 F.3d
at 366, 374.

Preliminary injunctive relief is "an extraordinary remedy" and should be
granted only in limited circumstances. *Am. Tele. & Tele. Co. v. Winback and
Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994). I point out,
however, that this is not the ordinary motion, *e.g.*, to restrain a defendant from
selling infringing products; rather, it is one to prevent the dissipation of assets
that might be used to satisfy a judgment.

### B.   Likelihood of Success

Because this is an action involving trademark and trade dress
infringement, my analysis necessarily turns on whether Juul has established a
likelihood of success on the merits of a violation of the Lanham Act.

The parties previously executed a consent preliminary injunction in
which defendants agreed to cease selling, marketing, or distributing products
containing the allegedly infringing packaging. (DE 29). Defendants' willingness
to agree to that injunction, says Juul, is significant. (DE 111 at 17). It points to
the October 31, 2018 Show Cause Order that states "JLI has demonstrated
that it is likely to succeed in showing that Defendants are selling products that
infringe JLI's trademarks and trade dress (the 'Infringing Products')." (DE 4 at
1–2). By agreeing to the subsequent Consent Preliminary Injunction Order (DE
29), suggests Juul, defendants tacitly accept that Juul will succeed on its
claims. (DE 111 at 17).

Defendants demur, claiming that their agreement to the consent
preliminary injunction (DE 29) does not constitute a concession that Juul was
likely to succeed on its claims. Rather, it was limited to the infringing
packaging, and reflected only the fact that they had discontinued that
packaging and had no plans to use it in the future. (DE 130 at 2).

I will accept *arguendo* the position that the Consent Preliminary Injunction does not obviate the need for a likelihood of success analysis. In subsection B.1, I analyze the likelihood of success as to trade dress and trademark infringement of the 4X Pod packaging. In subsection B.2, I analyze the newly-asserted claims that Eon's website infringes the Juul Wordmark.

### 1. Trademark Infringement and Trade Dress Infringement—the 4X Pod Packaging

Under the Lanham Act Section 32, 15 U.S.C. Section 1114(1):

(1) Any person who shall, without the consent of the registrant—

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive
>
> ...
>
> Shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(l)(a). Furthermore, the Lanham Act Section 43(a) proscribes certain forms of unfair competition, described as "false designation of origin" or "false description." 15 U.S.C. § 1125(a). The statute provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...
> >
> > shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

To state a claim for trademark infringement, 15 U.S.C. § 1114(1), and unfair competition/false designation of origin, 15 U.S.C. § 1125(a)(1), under the Lanham Act, a plaintiff must show three elements: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards"); *See also Chanel, Inc. v. Matos*, Civ. No. 14-3509, 2015 WL 4773072, at *10 n.6 (D.N.J. Aug. 13, 2015) ("Courts in the Third Circuit consider claims for trademark infringement and for false designation of origin under an identical standard.") (citing *A&H Sportswear*). A plaintiff bears the burden of proving these elements.

"To establish trade dress infringement under the Lanham Act, a plaintiff must prove that (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007).

I address the prerequisites of a valid trademark or trade dress in relation to the 4X packaging. (Sections II.B.a.1 & 2, *infra*). Once those elements are established, Juul must demonstrate consumer confusion. Because the analysis of likelihood of confusion overlaps as to Juul's trademark and trade dress claims, I will discuss it in consolidated fashion. (Section II.B.a.3, *infra*).

### a. *Trademark Claims: Valid Pod Mark Owned by Juul*

Juul has a good likelihood of success on the element that it owns a valid trademark. It has reproduced the Juul Pod Logo trademark and provided the registration number and the date of registration. (*See* Cplt. ¶¶ 22–23). An entry from the Trademark Status Document Retrieval database confirms that a certificate of registration was issued and that the Pod Logo trademark is

registered. (*See* DE 1–2, 1–5). A "certificate of registration issued by the United States Patent and Trademark Office constitutes prima facie evidence of the validity and ownership of a disputed mark." *Coach, Inc. v. Cosmetic House*, Civ. No. 10-2794, 2011 WL 1211390, *2 (D.N.J. Mar. 29, 2011) (certificate of registration by U.S. Patent and Trademark Office is sufficient to establish the first and second elements of trademark infringement and unfair competition claims).

I am satisfied that there is a likelihood of success as to the first two elements of trademark infringement with respect to Juul's Pod Logo trademark.

> **b. Trade Dress Claim:** *Package Design is non-functional and is distinct or has acquired secondary meaning*

Turning to Juul's trade dress claim regarding its packaging, I also find a likelihood of success on the issue of ownership of a valid trade dress.

First, the trade dress design is valid in that it is non-functional. "[T]he primary test for determining whether a product feature is functional is whether the feature is essential to the use or purpose of the product or whether it affects the cost or quality of the product." *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 354 (3d Cir. 2003) (citing *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 356 (5th Cir. 2002)). I find that Juul's product packaging does not affect the cost or quality of the product.

Second, I find that Juul's packaging comprises specific elements that together make up its distinct dress. The overall appearance creates a sophisticated and visually simplistic dress for consumers. *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) ("[T]he alleged trade dress must create some visual impression on consumers."). That is, the packaging features a monochromatic box, the Juul Pod Trademark Logo stacked vertically on the right side of the box, and a distinctive font with minimal text aligned on the upper left side.

### c. *Both Trademark and Trade Dress:* Likelihood of Confusion

The critical disputed issue for Juul's trademark and trade dress claims is whether there is a likelihood of customer confusion, *i.e.,* purchasers' confusing or conflating the 4X package and the Juul package.

A "likelihood of confusion" exists where "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Coach*, 2011 WL 1211390, at *3 (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991)). Courts consider a variety of factors when assessing whether two marks are likely to cause consumer confusion. In this Circuit these factors include, but are not limited to

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005) (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). The Third Circuit has "repeatedly insisted that the *Lapp* factors are not to be mechanically tallied, but rather that they are tools to guide a qualitative decision." *A & H Sportswear, Inc.*, 237 F.3d at 216.

"The single most important factor in determining likelihood of confusion is mark similarity." *Id.* Marks are confusingly similar if "ordinary consumers would likely conclude that [the two products] share a common source,

affiliation, connection, or sponsorship." *Id.* (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994)).

Reviewing those factors in relation to the 4X packaging, I find that they ultimately favor Juul.

With respect to factor one (degree of similarity), I find that the overall appearance of defendants' "pod" image is similar to the Juul Pod trademark. Juul contends that defendants' use of a similar "pod" like image on their packaging infringes on their trademark. Viewing the two "pods" together, I see that they have similar architectural features and design. Juul's comprises a rectangle shape with a hexagon in the center. The background coloring of the rectangles varies; the top portion above the hexagon, for example, may be maroon or green to signify the flavor of the pods. The bottom portion of the rectangle is most often colored with a dark color such as black. The interior hexagon by contrast often appears to be grey. Defendants' pod is likewise a rectangle with a shape (though a diamond, not a hexagon) in the middle. Defendants' rectangle has rounded corners. Defendants have also flipped the coloring of the top and bottom portions of the rectangle such that the top portion is black while a contrasting color is used in the bottom half of the rectangle.

That there are noticeable differences between these two "pods" is not enough, by itself, to compel a conclusion that they are not confusingly similar. Rather, the Third Circuit has stated that the test for determining the similarity of marks is "whether the[y] create the same overall impression when viewed separately." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994). Without finally deciding the matter, I here find a likelihood that a fact finder would find that the overall impression made by these pods depiction, when viewed separately, could be similar. Even if differences in coloring were noticed, the distinction could easily be chalked up to different flavors, rather than different sources of the goods.

Juul's trade dress packaging claim is a closer call.

On Juul's packaging, the distinctive Juul wordmark appears clearly and prominently on the upper left-hand corner in a distinctive font. The remaining text on the cover of the box states the flavor, the strength of the nicotine, and the number of pods in the box. Images of the Juul Pod trademark are vertically arranged to span the right side of the box. The box overall displays a simplistic design that was meant to distinguish Juul's product from others.

On Eon's packaging, there are distinguishing features. The 4X PODS designation appears in lieu of JUUL. The 4X PODS designation is in a different font, and the text is in a different size. The 4X PODS box includes a nicotine warning. The phrase "Juul compatible" appears on the package. Overall, the 4X PODS packaging appears more cluttered than Juul's packaging. These features, and particularly the prominent designation of brand name (4X PODS), tend to distinguish the packaging from Juul's. *Cf. Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir. 1972) ("The presence of [the source's] name on the product [stereo speaker cabinets] goes far to eliminate confusion of origin.") (emphasis supplied); *id.* at 310 ("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.").

Cutting against any finding of distinctness, however, is the overall similarity in layout and design of the packaging, as well as the use of a white background. Most notably, defendants' packaging highlights a series of pods. These, as noted above, are similar to Juul's Pod Logo trademark. Moreover, they are depicted in the same distinctive manner—*i.e.,* in a vertical stack on the right side of the packaging. I am mindful, too, that these are inexpensive, consumable products that are often marketed to younger buyers who may exercise little care in selection. Thus the overall appearance of these products with similar coloring schemes, "pod" shapes, fonts, and design aesthetics may cause greater confusion when viewed separately by the likely buyers (as distinguished from a side-by-side comparison in a judge's chambers).

Overall, I find that this first factor weighs somewhat in Juul's favor with respect to overall trade dress, but strongly in Juul's favor with respect to its Juul Pod Logo trademark claim.

With respect to factor two (commercial strength), there is little dispute. Juul has widespread commercial success. Juul alleges plausibly that its marks and trade dress are well known. Juul is the market leader, enjoying a 72% share of the market for e-cigarettes. Thus consumers would easily associate Juul's Pod Logo trademark and packaging trade dress with Juul's products. (Cplt. ¶ 17). I accept that Juul's Pod Logo trademark and trade dress have commercial viability.

As to the third factor (purchasers' care and sophistication), I find that this factor points in favor of Juul. The price of a four-pod package is approximately $15. (DE 30-9 at 10). Though a consumable item, it is not a pack of gum; neither, however, is it a refrigerator or an automobile. The relatively inexpensive price tag for the pods tends to support an increased likelihood of consumer confusion. *Versa Prod. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995) ("Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of a product, the more care that must be exercised in its selection."). Accordingly, I assume that individuals in the market to purchase such products exercise a relatively low standard of care and would therefore be more susceptible to confusion by defendants' use of the Pod Logo mark and trade dress.

The fourth and sixth factors (confusion) weigh slightly in favor of Juul. Where "products were ones consumers spend little time and care in selecting; in the case of such products, confusion as to their origin may pass unnoticed." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 (3d Cir. 1994). However, "it takes very little evidence to establish the existence of the actual confusion factor." *McNeil Nutritionals, LLC v. Heartland Sweeteners*, LLC, 511 F.3d 350, 366 (3d Cir. 2007) (citation omitted). Here, there is, at best, minimal evidence of confusion. For example, Juul points to Skype messages where even one of defendants' suppliers was confused; the supplier took the reference to

Juul on the packaging to mean that defendants had Juul's permission to use the name. (DE 111-1 at 14). Juul also refers to another message sent by Mr. Grishayev relating that U.S. Customs and Border Protection officers briefly detained some 4X pods because they thought the devices looked like Juul products. (DE 137-1 at 11–12). While this is by no means conclusive evidence, it favors a finding that Juul may be able to establish consumer confusion with respect to the trade dress claim and the Juul Pod Trademark claim.

The fifth factor, defendants' intent, points in favor of Juul. Juul asserts that defendants had actual knowledge of Juul's trademark and trade dress and intentionally designed their pod logo and packaging to mirror Juul's. (Cplt. ¶ 44). I find it likely that defendants intentionally used Juul's name, the Juul Pod Logo, and packaging design in designing their own package. At oral argument, Juul presented additional skype messages between defendants and a vendor/supplier on the subject of how to design the packaging. In this message, the supplier has inserted Juul's Pod Logo and packaging trade dress into a template to use as a base from which to design defendants' product packaging. Moreover, Mr. Grishayev and Mr. Tolmach in their deposition admitted to using Juul's trademarks to promote their products. (*See, e.g.*, DE 137-1 at 38).

The seventh, eighth, and ninth factors address the "nature of the services provided, the customers targeted, and the methods used to reach those customers." *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 444 (D.N.J. 2008) (addressing these factors together). These factors weigh in Juul's favor. The "greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint Sys., Inc.*, 269 F.3d at 288-89. "When the parties target their sales efforts to the same group of consumers, there is a greater likelihood of confusion between two marks." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 188 (3d Cir. 2010). The parties operate in the same industries, offer very similar products, and target the same audiences. Overall, these factors do lead me to believe that defendants' use of

the Pod Logo mark and packaging trade dress could cause consumer confusion.

Finally, in assessing factor ten (other factors suggesting the public might expect the prior owner to manufacture both products), "courts may look at the nature of the products or the relevant market, the practices of other companies in the relevant fields, or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 724 (3d Cir. 2004). Here, in light of the close relationship between the products and the similarities in the packaging of the products, consumers may perceive these similarities to suggest that defendants are owned by Juul. This factor thus favors Juul. *See Checkpoint*, 269 F.3d at 290 ("Evaluating this factor, courts look to evidence that … the products at issue are so closely related that the consuming public might find it natural for one company to" sell both.); *Lapp*, 721 F.2d at 462 ("The closer the relationship between the products, and the more similar their sales contexts, the greater the likelihood of confusion.").

Thus I find that almost all of the *Lapp* factors support a likelihood of success with respect to Juul's trademark and trade dress claims. I conclude that plaintiff has proven a likelihood of success on the merits of its claims of infringement in relation to the 4X packaging. Although I do not rely on the Consent Preliminary Injunction, it should come as no surprise that defendants voluntarily agreed to cease all development, production, and sales of all products using this package. (DE 29).

### 2.  Trademark Infringement – the "JUUL" Wordmark

As noted above, Juul recently filed a motion to amend the complaint (DE 108) to add claims of infringement of the "JUUL" wordmark (Reg. No. 4818664), a trademark it has held since September 22, 2015. Juul uses this wordmark to identify the source of its goods. (DE 109-1). While the wordmark appears on the Juul packaging, it does not appear on the 4X packaging. Juul alleges,

however, that Eonsmoke infringed its wordmark in other ways, chiefly on its website and in social media content.

The issues with respect to the JUUL wordmark are incompletely developed. Indeed, the motion to amend the complaint to add these issues remains pending. Still, Juul discussed these claims in their briefing and at oral argument, so I will briefly discuss the JUUL wordmark infringement claim.

As noted above, to state a claim for trademark infringement, 15 U.S.C. § 1114(1), a plaintiff must show three elements: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc.*, 237 F.3d at 210.

### a. *Trademark Claim: Valid Mark Owned by Juul*

Juul has a strong likelihood of success on elements (1) and (2)—that JUUL is a valid and protectable mark and that it owns that trademark. Juul's proposed Amended Complaint cites the JUUL wordmark, and provides the registration number and date of registration. (*See* DE 109-1 ¶¶ 26–27). Juul also attaches to the Amended Complaint a copy of an entry from the Trademark Status Document Retrieval database that confirms that a certificate of registration was issued and that the JUUL wordmark trademark is registered. (*Id.* at 47) These matters do not appear to be in dispute.

### b. *Trademark Claim: Likelihood of Confusion*

Again, the crucial issue is element (3), whether defendant's use of the word "Juul" in its social media and online advertising creates a likelihood of confusion.

Juul has pointed to instances where defendants have used the JUUL wordmark in their online and social media marketing. Juul points to, for example, instances where defendants have used the hashtags "#juul" "#juulcentral" "#juulgang" and "juulpods" without qualification to promote their products on the internet. (DE 111 at 6, 11–12). Juul also highlights that defendants marketed their pods online as "JUUL PODS WITH MORE BUZZ".

(DE 110-2 at 2). While the use of the JUUL wordmark without any qualifications gives me some concerns, I am unable to fully engage in a proper *Lapp* factor analysis at this time without more context to understand the nature and extent of defendants' social media and online marketing.

With respect to factor one (degree of similarity), I find that the few social media examples provided by Juul are inconclusive. Now obviously "Juul" and "Juul" are similar. Still, "[t]he mere appearance of Plaintiff's name or image as part of the search results displayed in response to a user-generated query does not mean that the relevant company used Plaintiff's name for advertising or trade purposes." *Obado v. Magedson*, No. 13 Civ. 2382, 2014 WL 3778261, at *7 (D.N.J. July 31, 2014), *aff'd*, 612 F. App'x 90 (3d Cir. 2015). Nevertheless, with respect to the use of hashtags in social media, there is case law support for the proposition that the use of Juul's wordmark beneath an image of an EON product could create a mental association between the two, and promote consumer confusion regarding these products. *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 377 (S.D.N.Y. 2018). Still, without more evidence as to how the wordmark is used in defendants' social media, this factor remains less than conclusive. I do not fault the plaintiffs for this; the claim is in its infancy.

The analysis as to factors two (commercial strength) and three (purchasers' care and sophistication), is the same as the analysis with respect to Juul's Pod Logo trademark and packaging trade dress claims. Concerning factor two, there is little dispute that Juul has widespread commercial success and that its mark is well known. As to the third factor, the relatively inexpensive price tag for Juul and EON products tends to support an increased likelihood of consumer confusion. *Versa Prod. Co.*, 50 F.3d at 204. These factors favor Juul.

The fourth and sixth factors (confusion) are inconclusive on this undeveloped record. Juul presents little evidence of consumer confusion with respect to their social media advertising. Are consumers looking for a Juul pod,

but being misdirected to an EON product? Are they intentionally searching for a lower-cost Juul-compatible product from another manufacturer? Evidence is lacking at this point. Thus, it remains to be seen whether a reasonable consumer viewing a social media post by defendants under account names such as "4Xpod", "Eonsmoke Pods", or "eonjuulcompatiblepod" would be confused simply because defendants use the JUUL wordmark in a hashtag accompanying that post. It is perhaps plausible that a consumer would believe that defendants products are synonymous with Juul under these circumstances, but it is also plausible that a consumer would view the same social media post and conclude that defendants' products are distinct products that are merely compatible with Juul's.

In regard to the fifth factor, defendants' intent in using the mark, I am also inclined to agree that defendants intended to benefit from the reputation and popularity of Juul. They repeatedly used the Juul name in their social media, and I must view that use in the context of other evidence of conscious imitation, see Section II.B.1.c, supra. This factor leans in Juul's favor.

The seventh, eighth, and ninth factors—the "nature of the services provided, the customers targeted, and the methods used to reach those customers," Primepoint, 545 F. Supp. 2d at 444—weigh in Juul's favor. As noted above, the parties operate in the same industries, offer very similar products and target the same audiences, often through social media and online advertising. These similarities therefore increase the likelihood of consumer confusion.

Finally, in assessing factor ten (other factors suggesting the public might expect the prior owner to manufacture both products), again without more context for how the Juul wordmark is used by defendants, it is hard to assess whether the use of the Juul wordmark in defendants' social media may cause consumers to assume that defendants are owned by Juul. This factor is therefore inconclusive.

The record is undeveloped in relation to the Wordmark claim, asserted for the first time in a proposed Amended Complaint. The critical third factor—consumer confusion—is suggested, but not firmly established.

### C.  Irreparable Harm: Asset Freeze

Having considered the likelihood of success as to both the packaging-related and Wordmark claims, I turn to the element of irreparable harm.

"Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 225 (3d Cir.1987) (citation omitted). For purposes of seeking a preliminary injunction to freeze assets, demonstrating irreparable harm requires "a showing that plaintiffs are likely to become entitled to the encumbered funds upon final judgment and a showing that without the preliminary injunction, plaintiffs will probably be unable to recover those funds." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990), *holding modified by Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994). Juul has the burden what profits it seeks to disgorge based on the claims asserted in its complaint. *A.I. Credit Consumer Disc. Co. v. Premiere Foods, Inc.*, No. CIV. 04-4049WHW, 2007 WL 3256733, at *7 (D.N.J. Nov. 5, 2007) ("[T]he burden of proof is upon the plaintiff ... to show the fact and extent of an injury and to show the amount and value of his or her damages.").

Turning then to the substance of the harm, Juul seeks to have this Court "freeze Defendants' assets to preserve their ability to pay any potential judgment in JLI's favor," including one for "disgorgement of Defendants' profits." (DE 111 at 29–30). Juul believes that defendants will be unable to satisfy any potential judgment because they are purposely dissipating their assets. Specifically, they are transferring the company's money to a personal brokerage account in the name of Mr. Grishayev and Mr. Tolmach, known as the "family office" account. Juul points to evidence that defendants have been

making regular transfers from the business checking account to that family office brokerage account. (*Id.* at 14–15).

I am not persuaded that there is irreparable harm here. While it is unusual that defendants are transferring the assets of their business to a personal brokerage account, it is not as if defendants have taken steps to dissipate these assets or spirit them abroad. They are, however, concededly and undeniably sweeping funds not needed for operating expenses from a low-interest or no-interest account to a more profitable brokerage account. They are admittedly using this nominally personal account as a *de facto* business account: "*guess we will just treat family office like the Eon checking acc[oun]t for next few years.*" (DE 111-1 at 6 (emphasis added)).

Juul has not adequately accounted for the scope of the "profits" as to which it would seek the equitable remedy of disgorgement. Juul claims that the "4X PODS and Eonsmoke branded products" earned $5.2 million in revenue from sales of 4X Pods products for the past 5 years (*id.* at 28; *see also* DE 111-3 (Eonsmoke sales by product from January 1, 2014 to October 25, 2019)). Juul then states that defendants earned $30 million in net revenue from the combined sales of 4X PODS branded products and other EON products in 2018. (*Id.*). Juul therefore asks this court to freeze *all* assets in defendants' two Chase checking and brokerage accounts. (DE 111 at 31).

There is a disconnect between the remedy Juul seeks—*all* assets in these accounts—and the relief requested in the Verified Complaint (DE 1)—an accounting of and disgorgement of profits from the offending 4X PODS products. (*See, e.g.*, Cplt. ¶ 6, Prayer for Relief). With respect to the time period at issue, Juul asserts that it registered its Pod Logo in October 10, 2017, first using it in commerce on March 28, 2016 (Cplt. ¶ 22). But it was not until "at least June 2018" that defendants began marketing their allegedly infringing products. (*See* DE 111 at 10). On December 6, 2018, I signed the parties' consent preliminary injunction order that barred defendants from selling the offending products and required them to surrender for destruction all offending

merchandise. (DE 29). Thus, the relevant time period for purposes of disgorgement of profits is June 2018 through December 2018. Rather than provide an accounting of the relevant profits for the specific 4X PODS profits at issue from June 2018 through December 2018, Juul instead provides revenue figures for all EON products. At oral argument, the parties seemingly agreed that the profits from the sale of allegedly infringing products was in the $400,000 to $500,000 range. (January 6, 2020 transcript at 50). Thus, Juul's request for an order freezing tens of millions of dollars would be far too broad a remedy. In any event, Juul has not carried its burden here as it has not established what the profits were for the allegedly infringing 4X PODS products during the relevant time period.

### D. Balance of Equities and Public Interest

Regarding the balance of hardships, defendants argue that any asset freeze would put them out of business. Because the FDA is particularly focused on Eonsmoke, they say, 2020 will be a challenging year for the company. These arguments are not persuasive. An asset freeze, especially one appropriately tailored to an amount commensurate with ill-gotten profits, would not put defendants out of business. Any regulatory woes are self-inflicted. Indeed, if the FDA has put them out of business, they cannot simultaneously claim irreparable harm because the plaintiffs have put them out of business.

The public interest in preventing further violations of the law and preserving viable assets outweighs an individual's interest in protecting potentially ill-gotten profits.[3] *See, e.g., CFTC v. British American Commodity Options Corp.,* 560 F.2d 135, 143 (2d Cir. 1977) (holding that a "court of equity is under no duty 'to protect illegitimate profits or advance business which is conducted [illegally]'"), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d

---

[3]     Defendants spend significant portions of their brief painting Juul as a "corporate miscreant" unconcerned with the public's health based on their extensive involvement in the ENDS industry. The Court places no weight on these arguments. If correct, they would equally apply to defendants, who are in the same industry and apparently are acting without FDA approval, to boot.

1147 (1978) (citation omitted); *Apple Computer*, 714 F.2d at 1255 ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections ...."); *PNY Techs.*, 2016 WL 4267940, at *3 ("It is not in the public interest to allow defendants to make themselves judgment-proof.").

## III. CONCLUSION

### A. Asset Freeze

I have weighed the relevant factors, as set forth above.

The showing as to the intertwined trade dress and Juul Pod trademark claims is strong in relation to Eon's 4X packaging. Damages, however, are modest—somewhere in the neighborhood of $300,000 to $500,000. There appears to be no great danger that defendants could not satisfy a judgment in that amount.

The showing as to the Juul Wordmark claim is weaker. This is not surprising; the claim appears for the first time in the proposed Amended Complaint. The showing of likely damages is weak at present. Defendants, it is true, have admitted to profit figures in the tens of millions of dollars. At oral argument, counsel suggested that "other products" could be involved, but did not identify any such products, so the Court may infer that these profits flow from the sale of Juul-compatible pods. Such pods, however, can be sold without infringement. The evidentiary gap, at present, is the failure to link these admitted profits to infringement of the Juul Wordmark. Such a showing, if it can be made, must await development of the proofs in discovery.

Accordingly, I will deny Juul's request for an asset freeze.

### B. Financial Reporting

Defendants should not come away from the foregoing with the impression that the Court is naïve, or that it will tolerate "LOL" as an appropriate reaction to its orders and judgments. Defendants have been slow-walking discovery. The piecemeal emergence of these Skype messages may suggest a motive for that strategy. The messages suggest a dismissive and cavalier attitude toward the prospect of liability for trademark infringement. The sense is not that defendants believe they are not infringing; it is that they,

in Mr. Grishayev's words, "don't care" about this lawsuit because they have already reaped huge profits and never intend to pay any potential judgment. (*See* pp. 4–6, *supra*). At oral argument, counsel portrayed the November 2018 messages as mere words— a rash or angry reaction to the recent filing of this lawsuit. Since then, however, discovery has brought to light a message dating from six months later, complaining about Juul's "creative" competitive methods and simultaneously noting the transfer of $1 million from the business account to the brokerage account. *See* p. 6, *supra* ("Moved another mil to fam office since we literally can't send money away fast enough").

It appears that defendants may regard the "family office" brokerage account as a means of sheltering profits from the business. Their Skype messages are consisting with such an understanding (*see* p. 6, *supra*), and their counsel, at oral argument, stressed that they were leaving enough money in the actual business checking account to cover likely obligations.

I find, to the contrary, that the defendants, by their own admission, are mixing business and personal funds, and that the "family office" brokerage account, as its dual name implies, is functioning as a *de facto* business account. I find a clearly expressed intent to move or conceal assets, if and when a judgment is imminent or entered. The urgency is diminished, however, by two facts: (a) some two years after the statements were made, no such steps have apparently been taken; and (b) the likelihood of any large judgment, at least on the Juul Wordmark claim, has not been firmly established.

I will therefore impose a requirement of quarterly reporting to Magistrate Judge Hammer. The defendants shall immediately submit the latest statements of the Chase checking account xxx3070 and the Chase brokerage account xxx5906. Thereafter, the defendants shall submit statements of the same accounts on a quarterly basis, beginning with the quarter ending March 31, 2020. Any new, separate, or substitute accounts shall be disclosed, and shall be subject to the same obligation. This reporting obligation shall continue for the life of this litigation, or until further order of the Court. Judge Hammer is empowered, of course, to bring the defendants to court at any time to explain

any deposits, withdrawals, or other movements of funds. Defendants are forewarned that any movements of funds outside the ordinary course of business, or with the evident intention of secreting assets, will be dealt with severely.

For the foregoing reasons, Juul's motion for a temporary restraining order or preliminary injunction is **DENIED** as presented. A requirement of quarterly reporting is imposed in according with the above Opinion.

A separate order will issue.

Dated: February 13, 2020

**Hon. Kevin McNulty**
**United States District Judge**