UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JUUL LABS, INC.,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**4X PODS, EONSMOKE, LLC d/b/a 4X PODS, GREGORY GRISHAYEV, MICHAEL TOLMACH, and JOHN DOES 1–50,**<br><br>    **Defendants.** | Civ. No. 18-15444 (KM) (MAH)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

Before the Court is the motion (DE 201)[1] of Defendants Eonsmoke, LLC, Gregory Grishayev, and Michael Tolmach (collectively "Defendants") to dismiss the complaint as against Grishayev and Tolmach.

This Opinion is one in a series; the facts and procedural history are well known to the parties. Juul Labs, Inc. initiated this trademark infringement action on October 30, 2018 through its filing of a Verified Complaint (DE 1).[2]

---

[1] Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Am. Compl." = Amended Complaint (DE 187)

[2] As explained in the February 13, 2020 Opinion, following the Complaint, the parties submitted a consent preliminary injunction, which I ordered on December 6, 2019. (DE 29). Defendants agreed to be preliminarily enjoined from:

    a) Directly or indirectly adopting, using, registering, or seeking to register any trademark, service mark or other type of mark, material, company, business or domain name, or other name, that would cause a likelihood of confusion with, tarnish, dilute, cause blurring, lessen the significance or value of, or otherwise infringe JLI's trademarks, trade dress or copyrights, as alleged in the Verified Complaint. Included within the meaning of a likelihood of confusion and infringement would be any mark,

1

To freeze Eonsmoke's assets pending a final judgment, Juul moved (DE 110) for injunctive relief. I initially denied that motion, concluding that while some claims had a likelihood of success on the merits, it was too early to assess others, and that an asset freeze was too broad a remedy. *Juul Labs, Inc. v. 4X PODS*, 439 F. Supp. 3d 341, 360-61 (D.N.J. 2020), *appeal dismissed*, 2020 WL 5240430 (3d Cir. July 24, 2020) ("*Juul I*"). Following an amendment to the Complaint, and further development of the factual record, Juul renewed its motion (DE 232), which I granted on December 22, 2020 (DE 251; DE 252). Now, I address Defendants' motion to dismiss the action against individual defendants Grishayev and Tolmach pursuant to Federal Rules of Civil Procedure 12(b)(2) (lack of personal jurisdiction), 12(b)(4) (insufficient process), 12(b)(5) (insufficient service of process) and 12(b)(6) (failure to state a claim upon which relief can be granted). (DE 201).

For the reasons provided here in, I will deny Defendants' motion.

**I.    Summary**

As background, I reproduce here the summary of facts from the December 22 Opinion (although I confine my analysis to the allegations of the Amended Complaint where appropriate).

---

name, package, or product that would cause a false or misleading association, connection, sponsorship, or affiliation with or endorsement by JLI;

b) Manufacturing, shipping, delivering, holding for sale, advertising, Marketing, promoting, displaying, transferring or otherwise moving, storing, distributing, renting, or otherwise disposing of, in any manner (including *347 through operation of any website), the 4X Product and/or related products referenced in the Verified Complaint, or colorable imitations thereof which use the Juul Pod Logo Trademark, Juul Packaging Trade Dress, and/or Copyrighted Works (as defined in the Verified Complaint);

c) Further infringing JLFs trademarks, trade dress and copyrights, and from injuring and damaging JLI's goodwill and reputation; and

d) Doing any act or thing likely to confuse, mislead, or deceive others into believing that Defendants, or any of them and/or their products or services emanate from or that Defendants themselves are connected with, sponsored by endorsed by, or approved by or otherwise affiliated with JLI.
(DE 29 at 3–4).

Juul developed an e-cigarette device and now dominates that market. *Juul I*, 439 F. Supp. 3d at 345. One component of that device is a pod filled with a proprietary blend of, among other things, liquid nicotine and flavoring. *Id.* A user inserts the pod into the device (which resembles a USB stick) and inhales. The device then vaporizes the liquid in the pod, allowing the user to "smoke" or "puff" the vapor (hence the term "vaping"). (Am. Compl. ¶ 2; *see generally* Food & Drug Admin., "Vaporizers, E-Cigarettes, and other Electronic Nicotine Delivery Systems (ENDS)" (Sept. 17, 2020), https://www.fda.gov/tobacco-products/products-ingredients-components/vaporizers-e-cigarettes-and-other-electronic-nicotine-delivery-systems-ends.) Juul makes pods, which it sells either as a component of Juul kits that include a device, or separately. (Thomas Rep. at 7.) Juul trademarked the word "Juul" and its logo and uses a distinctive packaging with those trademarks. (Am. Compl. ¶¶ 24, 26, 28, 30, Ex. 1, 2.)

Eonsmoke, an e-cigarette company ran by Gregory Grishayev and Michael Tolmach, developed its own pods, which are compatible with Juul devices.[3] To market those pods, Eonsmoke relied mostly on social media like Instagram, Twitter, Facebook, and Tumblr. (Tolmach Tr. at 74:6–8, 166:1–6, 184:1–7; Grishayev Tr. at 283:16–23.) Eonsmoke's posts mostly used the same format: (1) an image of the Eonsmoke product, which often included a label that the pod was "Juul compatible," accompanied by (2) a short caption describing the product or inviting the viewer to purchase it, followed by (3) hashtags. (Thomas Rep. at 14–21.)

A hashtag consists of the pound/number symbol (#), followed by text. When a social media user adds a hashtag to a post, the hashtag, which is hyperlinked, acts as a tag. This tagging has two consequences: First, if a viewer of the post clicks the hashtag, the social media platform will take the viewer to a page containing any other posts with that hashtag. Second, if a user searches that hashtag through the platform's search engine, the platform will take the user to the page containing any posts with that hashtag. Hashtags thus have an indexing or cataloguing function, "allow[ing] people to easily follow topics they are interested in" and "discover content and accounts based on [their] interests." Twitter, "How to use hashtags," https://help.twitter.com/en/using-twitter/how-to-use-hashtags (last visited Dec. 12, 2020). In other words, hashtags provide a way to link individual posts to larger topics and conversations.

When Eonsmoke entered the market, it included hashtags of other e-cigarette brands in its posts. It used "Juul" the most.

---

[3] Eonsmoke also created a subsidiary brand called "4X Pods." The 4X products and marketing are encompassed by this discussion.

3

Tolmach and Grishayev explained that they used "Juul" in hashtags to "promote" Eonsmoke. (*E.g.*, Tolmach Tr. at 74:6–8; Grishayev Tr. at 283:16–23.) Indeed, Eonsmoke recognized that, given the function of a hashtag, the hashtags would allow Eonsmoke's posts to be found *via* the Juul name. (Tolmach Tr. at 214:8–22.)

To illustrate the form of Eonsmoke's social media posts, I reproduce two representative examples, one from Instagram and one from Facebook, which I will call Post 1 (DE 231-2, Ex. 14, at 3 (sour berry flavor)) and Post 2 (Thomas Rep. at 19 (grape flavor)):






    Not long after Eonsmoke began this marketing strategy, its revenues shot up—from $2.3 million in 2017, to $30 million in 2018, to $90 million in 2019. (Thomas Rep. at 26.) Also during this time, Eonsmoke developed packaging that resembled Juul's and had retailers display the Juul and Eonsmoke products near one another. *Juul I*, 439 F. Supp. 3d at 346.

(DE 251 at 2-5)

    In the Amended Complaint, Juul asserted claims against Defendants for trademark infringement, trade dress infringement, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1116, 1117, 1125(a); copyright infringement arising under the Copy Right Act of 1976, 17 U.S.C. §§ 101 *et seq.*; trademark infringement and unfair competition under N.J. Stat. Ann. § 56:4-1 and state common law; and tortious interference with economic advantage. (Am. Compl. ¶1).

    Defendants raise three arguments for dismissal of the action as against individual defendants Grishayev and Tolmach: (1) this Court lacks personal

5

jurisdiction over Tolmach, who resides in California (Am. Compl. ¶13); (2) Juul failed to serve Tolmach with sufficient process; and (3) Juul cannot "pierce the corporate veil" to assert liability against either Grishayev or Tolmach. (DE 201-2 at 3). I will address each in turn.

## II. Discussion

### a. Personal Jurisdiction

To assess whether a court has personal jurisdiction over a defendant, a district court must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert, AG*, 155 F.3d 254, 258-59 (3d Cir. 1998). First, the court is required to use the relevant state's long-arm statute to see whether it permits the exercise of personal jurisdiction. *Id.*; Fed. R. Civ. P. 4(k). "Second, the court must apply the principles of due process" under the federal Constitution. *WorldScape, Inc. v. Sails Capital Mgmt.*, No. 10-cv-4207, 2011 WL 3444218, at *3 (D.N.J. Aug. 5, 2011) (citing IMO Indus., 155 F.3d at 259).

In New Jersey, the first step collapses into the second because "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales*, 384 F.3d at 96 (citing N.J. Ct. R. 4:4-4(c)). Accordingly, personal jurisdiction over a non-resident defendant is proper in this Court if the defendant has "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Provident Nat'l Bank v. Cat Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).

A Rule 12(b)(2) motion, such as the motion made by Defendants here, "is inherently a matter which requires resolution of factual issues outside the pleadings, i.e., whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990) (internal

quotation marks omitted) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

There are two kinds of personal jurisdiction: general and specific. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). I find that both apply here.

### i. Specific Jurisdiction

Specific jurisdiction arises from the defendant's forum-related activities that give rise to the plaintiffs' claims. The relevant analysis has three parts:

> First, the defendant must have "purposefully directed [its] activities" at the forum. Second, the litigation must "arise out of or relate to" at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"

*O'Connor*, 496 F.3d at 317 (internal citations omitted); *see also Strategic Prod. & Servs., LLC v. Integrated Media Techs.*, Inc., No. CV1800694KSHCLW, 2019 WL 2067551, at *7 (D.N.J. May 10, 2019).

Here, Juul submits that Tolmach has purposefully directed his activities to New Jersey in the following ways. Tolmach co-founded and located Eonsmoke in New Jersey. (DE 203 at 10; DE 203-1 at 5, Tolmach Tr. 18:2-3). Tolmach directed and controlled "the design of the infringing packaging for the 4X branded products ('4X products') that Eonsmoke imported and distributed from its location in Clifton New Jersey," (DE 203 at 10; *see* DE 203-1 at 7, Tolmach Tr. 107:3-8 (Tolmach testifying that he provided input for the packaging for the 4X products)). Tolmach used the Juul wordmark to promote the 4X products which Eonsmoke imported, distributed, and sold from its location in New Jersey. (DE 203 at 10; *see* 203-1 at 9, Tolmach Tr. 171:10-12 ("Q. You used the trademark Juul, J-u-u-l, to promote your EonSmoke products, right? A., Yes."); DE 203-5 at 5-7, Ex. 6 (Zeller Tr.) (office manager Kelly Zeller explaining that third-party suppliers ship products to the warehouse located in New Jersey and that orders are processed from the New Jersey warehouse)). Tolmach directed and controlled Eonsmoke's New Jersey

employees in selling products that Defendants marketed using Juul's trademark and trade dress. (DE 203 at 11; DE 203-5 at 5, Zeller Tr. (Zeller explaining that she discusses product shipment with Tolmach)). Juul also submits that its claim arises from those aforementioned actions because their claim arises from Defendants' alleged infringement of its trademark and trade dress by promoting and selling their product in New Jersey. (DE 203 at 11) And Juul submits that exercising specific jurisdiction over Tolmach comports with notions of fair play and substantial jurisdiction because Tolmach has earned over $20,000,000 in profits as the co-CEO of a New Jersey company and because Tolmach testified that he resides in New Jersey "for tax purposes" because it has "a lower tax rate." (DE 203 at 11-12; DE 203-1 at 6, Tolmach Tr. 28:15-17; *id.* 6:9-11).

Defendants submit that Juul's assertions relate to the general business of Eonsmoke and not any particular actions of Tolmach individually. I disagree. First of all, a very substantial portion of the business of Eonsmoke *is* the marketing of the pods, primarily through the internet. As outlined above, Juul pinpointed Tolmach's direction and control in the allegedly infringing products (DE 203-1 at 7, Tolmach Tr. 107:3-8) and demonstrated that those products are prepared for shipment in New Jersey (DE 203-5 at 5-7, Zeller Tr.). This infringement action clearly arises from those activities because Juul alleges that Tolmach directed the use of Juul's trademarks and trade dress in promoting and selling the 4X products. (Am. Compl. ¶¶ 13, 17, 53, 57, 132-135). Finally, I find that exercising specific jurisdiction over Tolmach comports with fair play and substantial justice because Tolmach chose to establish a company in New Jersey and testified that he "lives" in New Jersey, if only for "tax purposes," whatever that may mean. Given the above I find this Court may assert specific jurisdiction over Tolmach.

    **ii.**    **General Jurisdiction**

In the alternative, I consider general jurisdiction. General jurisdiction applies when an individual is domiciled in the forum state. *Chanel, Inc. v. Matos,* 133 F. Supp. 3d 678, 684 (D.N.J. 2015) ("[A]n 'individual's domicile,' or

8

home, constitutes the paradigmatic 'forum for the exercise of general jurisdiction.'") (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). "[D]omicile is established by an objective physical presence in the state or territory coupled with a subjective intention to remain there indefinitely." *Washington v. Hovensa LLC*, 652 F.3d 340, 344, 55 V.I. 1265, 1270 (3d Cir. 2011) "In determining an individual's domicile, a court considers several factors, including 'declarations, exercise of political rights, payment of personal taxes, house of residence, and place of business.'" *Park v. Tsiavos*, 165 F. Supp. 3d 191, 199 (D.N.J. 2016), *aff'd*, 679 F. App'x 120 (3d Cir. 2017) (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1301 (3d Cir. 1972)) (laying out the standard of establishing domicile in the context of diversity jurisdiction). Other factors "may include location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, and driver's license and vehicle registration." *Id.* (internal quotation marks omitted) (quoting *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 291 (3d Cir. 2006)).

Defendants contend that this Court does not have general personal jurisdiction over Tolmach because "Tolmach has been domiciled exclusively in California for eight years." (DE 201-2 (citing DE 201-1, Tolmach Decl. ¶ 2 ("In 2012, I moved my residence from New York to California, where I have lived ever since."). He states that, although a 50% partner in Eonsmoke, of Clifton, New Jersey, he handles the business from his home office in California, and has come to New Jersey only a few times in the last eight years. In his Declaration, Tolmach also stated that he never resided in New Jersey. (DE 201-1, Tolmach Decl. ¶2).

Juul notes, however, that in his December 17, 2019 deposition, Tolmach testified that he lives in New Jersey and splits his time through the year between his New Jersey and California residences. (DE 203 at 9 (citing DE 203-1, Ex. 1 (Tolmach Tr.) 5:16-21)). Specifically, Tolmach testified that "for tax purposes" he lives in West New York, New Jersey. (DE 203-1 at 3, Tolmach Tr. 5:17-18). Juul also notes, *inter alia*, that Tolmach identified his New Jersey

9

address on Eonsmoke's 2018 federal tax return (DE 203-2 at 3, Ex. 2); Tolmach testified that he pays taxes in New Jersey (DE 203-1 at 4, Tolmach Tr. 6:9-11); and Tolmach's January 2020 bank statement lists his New Jersey address (DE 167-5 at 2). (DE 203 at 9). Juul contends those factors establish that Tolmach is domiciled in New Jersey and subject to this Court's general jurisdiction. (*Id.*) Defendants submit that Juul relies on "stale evidence" that is not relevant to demonstrating his domicile at the time of institution of this action. (DE 205 at 6). According to Defendants, "[t]he only evidence of Tolmach's relevant domicile is his declaration, which states unequivocally that he lives in California." (DE 205 at 6).

It is clear that Tolmach's declaration that he never resided in New Jersey contradicts the record evidence and directly contradicts his December 2019 deposition. To the extent that Defendants may be arguing that Tolmach changed his domicile, "[p]roof of a change in domicile requires both residence and intent to remain." *Bansal v. Chakrala*, No. CIV. 11-1287, 2011 WL 2148825, at *4 (D.N.J. May 31, 2011). In assessing the change, a court can only assess the evidence as it stands at the time the action was initiated; that is, when the complaint was filed. *Id.* Here, the only evidence that Tolmach changed his domicile is his declaration that he "never resided in New Jersey," which is directly contradicted by the record. Given Tolmach's 2019 testimony that he lives in New Jersey, his bank statements listing a New Jersey address, and Eonsmoke's tax documents listing Tolmach's New Jersey address, I find that Tolmach is subject to this Court's general jurisdiction.

### b. Service of Process

Next, Defendants contend that Tolmach was never duly served with process. (DE 201-2 at 5). "Federal Rule of Civil Procedure 4 establishes the procedural requirements that must be met for proper service under Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5)." *Moses v. Amazon.com.dedc LLC*, No. 168675, 2019 WL 7293590, at *2 (D.N.J. Dec. 30, 2019). Under Federal Rule of Civil Procedure 4(e)(2)(B), "an individual—other than a minor, an

10

incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by: . . . leaving a copy of [both the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there [.]" Fed. R. Civ. P. 4(e)(2)(B).

The proof of service forms indicates that Juul hired a process server who provided the Summons and Amended Complaint to Al Tolmach, identified as a "household member." (DE 202 at 1). The form describes the person who accepted service: a female, forty years or older, 5-5- in height, weighing around 120 pounds, with white skin and blonde hair. (*Id.*) Those details of service are corroborated by the Declaration of Carlos Canas, the process server. (DE 204-2 at 1) Moreover, as Juul submits, the fact that the process server was able to name Tolmach's sister and describe her appearance corroborates his account.

Tolmach submits a declaration from his sister, Albina Tolmach. (DE 205-1) She states that she came to the door and spoke to a person who wore a badge and "interrogated" her. Afraid of COVID-19 infection, she refused to open the door. She admits that he left a stack of paper outside the door. I disregard Tomach's secondhand account that he heard from his sister that the person "dropped some paperwork on the ground, without speaking to anyone." (DE 201-1 at 2, Tolmach Decl.). Tolmach acknowledges that his sister received the papers, but says she "threw away the paperwork" before Tolmach arrived. (*Id.*) At the very least, even in Mr. Tolmach's account, his sister actually, physically received the papers; if, as he claims, she threw them away, that does not detract from the adequacy of service under the Rule, which requires only that they be left with a person of suitable age and discretion. And obviously Mr. Tolmach has received notice in fact of the pendency of this action.

I therefore find that Tolmach was properly served under Federal Rule of Civil Procedure 4(e)(2)(B).

### c. Individual Liability

Finally, Defendants contend that the Amended Complaint fails to plead facts sufficient to pierce the corporate veil and impose individual liability on Grishayev and Tolmach. (DE 201-2 at 5)

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Here, Defendants contend that the Amended Complaint fails to plead facts sufficient to pierce the "corporate veil" and hold Grishayev and Tolmach individually liable. (DE 201-2 at 10).[4]

Under New Jersey law, two elements must be established to pierce the corporate veil: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *State Capital Title & Abstract Co. v. Pappas Bus. Servs.*, LLC, 646 F. Supp. 2d 668, 679 (D.N.J. 2009) (internal quotation marks omitted) (quoting *The Mall at IV Group Properties, LLC v. Roberts*, No. 02–4692, 2005 WL 3338369, at *3 (D.N.J. Dec. 8, 2005)). To establish unity of interests, the Third Circuit applies six factors to guide the analysis:

> [1] gross undercapitalization … [2] "failure to observe corporate formalities, non-payment of dividends, [3] the insolvency of the debtor corporation at the time, [4] siphoning of funds of the corporation by the dominant stockholder, [5] non-functioning of other officers or directors, absence of corporate records, and [6] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders."

*Id.* (alteration in original) (quoting *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir.1988)). As for the second element, "a plaintiff need not prove common law fraud but instead demonstrate that the defendants, via the corporate form, perpetrated 'a fraud, injustice, or the like,' a less exacting standard." *Id.* (quoting *Group Properties*, 2005 WL 3338369, at *3). In the absence of fraud or injustice, or other extraordinary circumstances, a court will generally decline to pierce the corporate veil. *Id.*

Although not dispositive, Judge Hammer's analysis (DE 184) of this precise issue in granting Juul's motion to amend the Complaint is helpful to the Court. *See United States v. Andover Subacute & Rehab Ctr. Servs. One, Inc.*,

---

[4] The parties focus on this theory of individual liability. I do not reach any issue as to the availability of others.

13

No. 12-03319, 2019 WL 4686963, at *1, n.5 (D.N.J. Sept. 26, 2019). As Judge Hammer found, Juul sufficiently pleaded facts to demonstrate the unity of interest element. Juul alleges that "Eonsmoke is merely a façade by which Defendants Grishayev and Tolmach perpetrate their fraudulent and illicit activities." (Am. Compl. ¶147). As evidence of that façade, Juul alleges and cites evidence that Grishayev and Tolmach treated a "family account" as the Eonsmoke checking account, stating that they would transfer money back to the corporate account as needed for, *e.g.,* tax obligations. (Am. Compl. ¶141). Further, Juul alleges that "Eonsmoke co-mingles funds with other of Grishayev and Tolmach's business entities such that there is no distinction between the individuals and the company." (Am. Compl. ¶ 140 (citing Ex. 7 demonstrating transfers to Glidecraft LLC)).

Further, the Amended Complaint alleges that Eonsmoke does not comply with corporate formalities. (Am. Compl. ¶137). As proof, Juul presents, *inter alia*, Grishayev's testimony that while he is the chief financial officer of Eonsmoke, he and Tolmach "rotate the titles" because "they really have no meaning" and they are just something Grishayev and Tolmach "put on the card". (Am. Compl. Ex. 5, DE 187 at 100-101). The Amended Complaint also alleges that Eonsmoke siphoned Eonsmoke's funds to leave the company judgment proof. (Am. Compl. ¶¶ 142-143). The Amended Complaint contains messages from Tolmach stating that he "will never sign [a] check to Juul" and messages from a non-party suggesting that Eonsmoke could "move [its] money away." (Am. Compl. ¶142 (second alteration in original)).

In light of the above, I find that the Amended Complaint contains sufficient factual allegations to demonstrate a unity of interest. Contrary to Defendants' assertions, the Amended Complaint does not contain "mere conclusions" but offers plausible allegations, with accompanying support, that Eonsmoke was merely a façade, failed to observe corporate formalities or separate its financial assets from the individuals' assets, and siphoned funds.

I also find the second element satisfied. As Judge Hammer noted, the Amended Complaint alleges that Grishayev and Tolmach used Eonsmoke to

14

evade regulation by the Food and Drug Administration ("FDA"). (Am. Compl. ¶147). Using an entity to avoid government regulation is indeed an injustice. The Amended Complaint plausibly pleads facts demonstrating that Eonsmoke was used to infringe upon Juul's trademark and trade dress. (*See* December 22, 2020 Opinion, (DE 251 at 8-22) finding that Juul is likely to succeed on its claim that Eonsmoke's use of the Juul wordmark in social media posts and online advertising is infringing). Therefore, I find the Amended Complaint establishes a plausible basis for piercing the corporate veil and imposing individual liability on Grishayev and Tolmach.

### III. Conclusion

For the reasons set forth above, I will deny Defendants' motion (DE 201) is dismiss the Amended Complaint as against Grishayev and Tolmach. An appropriate order follows.

Dated: January 7, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**